AO 91 (Rev. 11/11)  Criminal Complaint



# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

FILED

SEP 03 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| Hilda Tacorda, | ) Case No.   3  19  71432 |
| | ) |
| | ) |
| | ) |
| *Defendant(s)* | ) |

UNDER SEAL

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of _____November 30, 2017_____ in the county of _____San Francisco_____ in the
_____Northern_____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form: _____

WILLIAM FRENTZEN
Assistant United States Attorney

_____
*Complainant's signature*

Katelyn McKendrick, Special Agent - FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____8/3/19_____

_____
*Judge's signature*

City and state: _____San Francisco, California_____

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Katelyn McKendrick, Special Agent with the Federal Bureau of Investigation ("FBI") being duly sworn, hereby depose and state as follows:

I.    INTRODUCTION

A.    SYNOPSIS

1.    I submit this affidavit in support of a criminal Complaint for HILDA TACORDA (hereafter "TACORDA").

2.    There is probable cause to believe TACORDA has engaged in receving cash kickback payments in exchange for the referral of patients in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3.    As part of this investigation, agents have obtained information and evidence from an FBI cooperating witness "CW-1"[1] and evidence obtained by FBI undercover employee ("UCE").

4.    During the course of the investigation, the UCE held

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services.  However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation.  As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased.  These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA.  A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship.  CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer.  The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers.  Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture.  The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status. After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual - with whom he/she had a personal dispute - with a law enforcement investigation into the practices of this individual. To my knowledge, those threats were never carried out. CW-1 is not currently the subject of any pending criminal charges.

multiple in-person audio and video recorded conversations with
TACORDA in 2017 and 2018, in which TACORDA received kickback payments
in the form of cash in exchange for the referral of patients.

    **B.**    **BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION**

    5.    Starting in the 1970s, Congress created, amended, and
strengthened the "Anti-Kickback Act", currently United State Code,
Title 42, Section 1320a-7b(b).  The relevant language of the statute
is listed below.  In essence, the law criminalizes influencing
referrals for federally funded health care through payments. The
legislative history revealed Congress was deeply concerned the
normalization of kickbacks in federally funded health care programs
would lead to fraud and an undermining of the quality of patient
services since "operators become more concerned with rebates than
with care."  FBI Agents began looking into kickbacks in the San
Francisco Bay Area, specifically in the fields of home health and
hospice.  Their investigation arose from concerns of false billing,
referrals without patient care in mind, that health care providers
would have a willingness to expose their patients to unnecessary
treatments and that certain home health agencies ("HHAs") would have
a willingness to bill for, but not provide, necessary services.  The
preliminary investigation into kickbacks occurring in the Bay Area in
the fields of home health and hospice revealed that the above
concerns were indeed occurring.  Some of the most egregious examples
uncovered by the investigation included doctors who referred patients
to hospice care in exchange for kickbacks while demanding a
"longevity" bonus – meaning the doctor would financially benefit the
longer a patient remained on hospice. Since hospice is generally
meant for palliative care without curative intent, this system could

encourage doctors to abandon curative options earlier with
potentially life threatening outcomes.

6.    An undercover operation was selected as the means of
investigating kickbacks.  From training and experience, the
investigators understood that health care providers and HHAs shrouded
their activities in secrecy.  Typically, health care providers were
given kickbacks in the form of cash payments made in closed door
meetings between themselves and HHA representatives.  Some used bogus
medical directorship/consultant contracts to disguise kickbacks as
payments for seemingly legitimate, but actually non-existent,
services.  Given the expected closed nature of the transactions and
the relatively traceless nature of cash payments, traditional
documentary and other overt investigative techniques were deemed to
be ineffective.  An undercover operation ("UCO") was considered as
the most efficient and most successful means to gather direct
evidence of the payments and the corrupt intent of the kickback
payments.

7.    Around July 2016, two employees of a known Bay Area home
health agency ("HHA Alpha") made a complaint to Health and Human
Services Office of Inspector General ("HHS-OIG") regarding payments
of kickbacks to doctors by other HHAs in the Bay Area.  One of the
two agreed to serve as a cooperating witness ("CW-1").  CW-1 was
paired with an undercover FBI agent ("UCE"), based in San Francisco,
who would portray himself/herself as someone representing investors,
intent on acquiring HHA Alpha and seeking to expand HHA Alpha's
patient population through illegal kickbacks.  UCE often communicated
with targets in furtherance of the UCO while in San Francisco.  The
UCO sought to investigate predicated targets and to use predicated

3

targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

8.    In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required.  For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks.  Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand.  The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies.  Further, the care provided by the vetted HHA could be monitored and reviewed.

9.    In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation in the UCO.  The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations.  Additionally, the FBI

consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations.  From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints, which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency.  Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care. During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of Public Health did not result in any negative finding against HHA Alpha.  No other complaints about HHA Alpha were reported to Medicare through the duration of the UCO.  During the course of the UCO, a total of 27 subjects were paid kickbacks and referred patients to HHA Alpha.  At no time during their meetings with CW-1 and/or UCE did the subjects express any concerns regarding the treatment of their patients by HHA Alpha nor notify that any patient complaints had been

received. Further, none of the subjects indicated they were aware of any illicit conduct by HHA Alpha prior to or during the UCO.

### C.   AGENT QUALIFICATIONS

10.   I am a Special Agent of the FBI and have been so employed since 2015.  I am currently assigned to the Complex Financial Crime Squad of the FBI's San Francisco Field Division.  As part of my assigned duties, I investigate possible violations of federal criminal law.  I have received specialized training in health care fraud matters including, but not limited to, Anti-Kickback, Mail Fraud, Wire Fraud, and False Claims.  I have participated in the execution of multiple arrest and search warrants in which business and personal documents, bank records, computers, and other evidence of health care fraud and other crimes have been seized.

11.   The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and the circumstances described herein, and information gained through my training and experience. This affidavit is intended to show that there is sufficient probable cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

**D.   COMPLAINANT**

12.   HILDA TACORDA, is a 40-year-old citizen of the Philippines and a U.S. legal permanent resident who is believed to reside in Hayward, California.  During the course of the investigation, TACORDA accepted over $5,500 in kickbacks from an FBI UCE in exchange for patient referrals and the introduction of a hospital case manager willing to engage in the scheme.

**E.   STATUTES VIOLATED**

13.   **Title 42, United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to in return for referring an individual to a person for the furnishing or arranging from the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

II.  PROBABLE CAUSE

**A.   CASE SUMMARY**

14.   During the course of the investigation, the FBI identified AMITY as being involved in a conspiracy to pay kickbacks to doctors and other medical professionals for the certification or referral of patients for home health or hospice services.  In effect, the FBI believed that employees and/or affiliates of AMITY were bribing individuals associated with hospitals, skilled nursing facilities, and doctors' offices in order to induce those individuals to send patients to AMITY. TACORDA was employed with AMITY.

15.   Information provided by CW-1, physicians, and other health care professionals (including, but not limited to, hospital case

7

managers, social workers, and home health marketers) indicated AMITY controlled the majority of patient referrals coming to area HHAs from surrounding hospitals and medical offices. Per a number of individuals identified during the investigation, AMITY's control over the patient referral market was reportedly the result of the agency's willingness to pay kickbacks for patient referrals and outbid other HHAs engaged in similar kickback schemes. Based on a review of Medicare claims data of multiple HHAs within the San Francisco Bay Area, AMITY appeared to have significant control of the patient population compared to other HHAs in the surrounding area. Since January 1, 2013, AMITY has received approximately $105,000,000 in payments from Medicare for home health services purportedly rendered.

16. In January 2017, CW-1 identified GLENNDA SANTOS ("SANTOS") as a prominent marketer employed by several HHAs in the area, including AMITY.

17. CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area. In so doing, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs.

18. In March 2017, the FBI began the UCO and the UCE as CW-1's business partner. The UCO initially focused on SANTOS and individuals believed to be accepting kickbacks from her.

19. As part of the UCO, CW-1 and the UCE told SANTOS that they were partnering to increase the patient population at HHA Alpha. CW-1 and the UCE told SANTOS that CW-1 and several investors, represented by the UCE, would eventually buy HHA Alpha at a later

date.  As part of their agreement, SANTOS would introduce the CW-1
and the UCE to individuals willing to accept kickbacks for patient
referrals.  The UCE further told SANTOS she would receive an interest
in HHA Alpha as compensation for the introductions.  Later, the UCE,
the CW-1, and SANTOS agreed that SANTOS would be compensated in cash
for each patient referral or introduction to physicians, case
managers, or other health care professionals who could refer patients
to HHA Alpha.

20.   The UCO was based on a referral system; identified co-
conspirators would introduce medical professionals to CW-1 and the
UCE who were willing to participate in a similar patient referral
kickback scheme.

21.   During the course of the UCO, SANTOS introduced multiple
individuals, to include, physicians and case managers willing to
accept kickback payments in exchange for home health or hospice
patients.

**B.   TACORDA ACCEPTS KICKBACK PAYMENTS IN EXCHANGE FOR THE**
**REFERRAL OF MEDICARE PATIENTS**

22.   On or about August 30, 2017, CW-1 and the UCE had
conversations with SANTOS and TACORDA in which (1) SANTOS introduced
TACORDA to CW-1 and the UCE; (2) SANTOS provided a patient referral
to the CW-1 and UCE; and (3) TACORDA completed the referral with the
CW-1 and UCE.  I believe the purpose of these exchanges was to
establish a relationship between TACORDA, CW-1, and the UCE for the
purpose of making kickback payments to TACORDA in exchange for
patient referrals.  The UCE, CW-1, and SANTOS previously agreed that
SANTOS would introduce CW-1 and UCE to individuals willing to accept

kickbacks for patient referrals.  Relevant excerpts of those exchanges are:

     a.  At approximately 8:30 p.m., SANTOS, CW-1, and the UCE exchanged text messages.  During this conversation, SANTOS introduced TACORDA to CW-1 and the UCE as her "marketer in San Jose."  This conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| SANTOS: | [SANTOS sends a screenshot depicting the contact information for TACORDA, including SUBJECT TELEPHONE NUMBER 1] | |
| SANTOS: | Pls call her | Because this statement immediately followed SANTOS sending TACORDA's contact information, I believe "her" refers to TACORDA. |
| CW-1: | Ok | |
| CW-1: | Just left her a msg | |
| SANTOS: | [Patient 1] | |
| SANTOS: | [Patient 1] Patient from RMC<br>Faxing to your office now<br>Alert your intake pls | I believe "RMC" refers to Regional Medical Center, a hospital in San Jose, CA.<br><br>Throughout this affidavit, I have removed patients' names to protect their privacy, and have referred to them instead as "Patient 1," "Patient 2," etc. |
| SANTOS: | Family is requesting a meeting tomorrow morning | |
| CW-1: | At RMC | |

| Speaker | Text Statement | Additional Explanation |
|---------|----------------|------------------------|
| SANTOS: | Pls have someone answer they curaspan | It is my understanding that Curaspan refers to an online software program that assists companies with the discharge and intake of patients; for example, the discharge of a patient from a hospital to the intake of a home health agency, skilled nursing facility or post-acute facility. |
| SANTOS: | Text Hilda | Based on the context of this conversation, I believe this is a reference to TACORDA. |
| SANTOS: | Works better | |
| CW-1: | Done and spoke with Hilda as well | |
| SANTOS: | Hilda is my marketer in San Jose I talked to her yesterday, all hospice will be directed to u thru her.  From her contacts | Typically, a legitimate home health marketer would meet with doctors, hospital case managers, and other health care professionals to provide promotional information about the agency in an effort to obtain patient referrals.  Based on my training and experience, however, the term "marketer" is also known to refer to individuals willing to pay kickbacks for the referral of patients. |
| CW-1: | I will be in San Jose tomorrow.  Let me know if you want me to meet her and take care of her then.  Or either way you like. | By "take care of her," CW-1 was suggesting paying a kickback to TACORDA in exchange for the patient referral. |
| CW-1: | And thank you. Will chat more tomorrow. | |

b.  At approximately 8:40 p.m., TACORDA sent an iMessage to CW-1 confirming Patient 1's name.  This conversation included the following statements, to which, where called for, I have added

11

additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| TACORDA: | [Patient 1] | |
| CW-1: | Notified intake to accept right away. | |
| TACORDA: | Thank U | |
| CW-1: | Thank you and looking fwd to meet you as sometime soon | |
| CW-1: | ... | |
| CW-1: | Pt- [Patient 1], j- not on curaspan yet, will keep checking | |
| TACORDA: | Let me follow up | |
| TACORDA: | He will send at 4 | |
| | ... | |
| TACORDA: | Terence just sent referral | I believe this is a referral to TERENCE TIRONA, who works as a case manager at RMC. |
| TACORDA: | He will send hospice order before he leaves | |

23. On or about November 28, 2017, through November 29, 2017, TACORDA and CW-1 discussed, via iMessage, the referral of a patient and logistics surrounding an in-person meeting for the kickback payment to TACORDA. This conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| TACORDA: | Have a hospice for you | |
| CW-1: | Sweet | |
| TACORDA: | [Patient 2] | |
| CW-1: | Pt going home or SNF | I believe "SNF" refers to a Skilled Nursing Facility. |

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| TACORDA: | Which snf u contracted with | |
| CW-1: | Where is PT | I believe "PT" refers to a patient. |
| TACORDA: | RMC | |
| CW-1: | Can you pls fax or email me referral | |
| TACORDA: | Yes | |
| | ... | |
| CW-1: | Let's meet up on Thursday next week around lunch.  Will that work for you? We Ike to say thank you as soon as we can | The CW-1 is attempting to schedule an in-person meeting with TACORDA to pay her for the patient she referred to CW-1's home health agency, HHA Alpha. |
| TACORDA: | Sure! | |
| CW-1: | Also ask Terence if he is ok to meet Thursday with you as well.  What do you think? | In mentioning "Terence," the CW-1 was referring to TIRONA. |
| CW-1: | So we can give you the referral thank you too. | |
| TACORDA: | Will ask him | |
| CW-1: | My bad I meant this Thursday also if Terence is ok to meet we can thank him and give him his envelope too | I believe, "thank you" and "envelope" refer to kickback payments usually in the form of a cash payment and placed into an envelope for concealment. CW-1 is informing TACORDA that CW-1 will also pay TIRONA for the referral of patients. |
| TACORDA: | K will let you know about T | |
| CW-1: | Ok cool and see you Thusday around noon | |
| TACORDA: | Sounds good | |

24.  On or about November 30, 2017, CW-1 and the UCE met in person with TACORDA to discuss payment for the patient TACORDA referred to CW-1.  The meeting was recorded.  During the meeting, the UCE paid TACORDA a total of $1,000 in cash -- $500 for the referral of a patient and $500 for the introduction of an RMC hospital case manager, TIRONA.  This conversation included the following

statements, to which, where called for, I have added additional
explanation and context based on my training, experience, and facts I
have learned through this investigation:

| Speaker | Verbal Statement | Additional Explanation |
|---|---|---|
| TACORDA: | So I'm glad, did that work out ok? | Based on the context of this conversation, I believe "that" is a reference to the referral of Patient 2 to HHA Alpha and the introduction of TIRONA. |
| CW-1: | It did work out, yes. | |
| TACORDA: | Ok good. | |
| CW-1: | Perfectly fine.  We met Terence earlier so- | Prior to meeting with TACORDA, the CW-1 and the UCE met with TIRONA and provided him with an envelope which contained $500 in cash.  The payment of $500 was for the referral of one patient.  TIRONA agreed to provide home health and hospice patients to the CW-1 and the UCE in exchange for payment. |
| TACORDA: | Ok. | |
| CW-1: | -everything is good. | |
| TACORDA: | Oh cool. | |
| UCE: | So basically what we're looking for is more of the referrals of people to meet. | |
| TACORDA: | Um hm. | |
| UCE: | But of course, patients are great too.  So we have a system in place but you know, we don't want to offend anyone.  Is there, is there a rate that you … | The UCE is explaining to TACORDA that the UCE and CW-1 are interested in introductions to individuals willing to accept kickback payments for the referral of patients and will pay TACORDA for the introduction as well as any patients she's able to refer. |
| TACORDA: | No this is just a, you know… | |
| UCE: | A little bonus. | |

| Speaker | Verbal Statement | Additional Explanation |
|---------|------------------|------------------------|
| TACORDA: | Cause I have my main and then- My thing is, this is like, let's start it, let's see how it goes and if it's, you know, produces more then we'll talk again. Yeah. | I believe that TACORDA is referring to "I have my main" as her employment with AMITY and that she is looking to make some extra money on the side based on how the current transaction goes. |
| UCE: | Alright, sounds good, perfect. Um so I actually have something for you- Would you- would you like to go to your car? I can give it to you here. | The UCE suggests paying a kickback to TACORDA in her car because it is illegal to accept kickbacks for referrals of Medicare patients, and TACORDA may wish to conceal the transaction. |
| TACORDA: | No I'm fine. This is not my territory. [laughs] This is not, yeah. | |
| UCE: | So in this envelope, there's a thousand. | At this point, the UCE handed TACORDA an envelope containing $1,000 in cash. |
| TACORDA: | Oh wow, that's kinda a lot. | |
| UCE: | Well, so what it is, is because you've delivered on the patient and then for the relationships we give five hundred. | By "relationships," the UCE was referring to TACORDA introducing the CW-1 and UCE to TIRONA for the purpose of paying kickbacks for patient referrals. |
| TACORDA: | Oh ok. | |
| UCE: | And he's ok now, so that that's entirely yours. | |
| TACORDA: | Was he ok with it? | I believe TACORDA is referring to TIRONA and asking whether he accepted the kickback agreement related to the referral of patients. |
| UCE: | Yeah. He uh - | |
| TACORDA: | Ok. It took me a while to get him. | I believe when TACORDA replied "It took me a while to get him", TACORDA was saying that it was difficult for TACORDA to bring TIRONA into the kickback payment scheme. |

25. TERENCE TIRONA ("TIRONA") was a hospital case manager at REGINAL MEDICAL CENTER ("RMC") located in San Jose, California with

the ability to refer patients to home health and hospice agencies. During the course of the investigation, TIRONA referred a number of patients to HHA Alpha and introduced CW-1 and the UCE to at least two additional hospital case managers which have also referred patients to HHA Alpha in exchange for kickback payments. The UCE has made kickback payments to TIRONA.

26. On or about March 24, 2018, TACORDA sent iMessages to CW-1 for the purpose of referring a patient to the CW-1. This conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| TACORDA: | Can I send referral via email? | |
| TACORDA: | Ok sent | |
| | … | |
| TACORDA: | After u talk to Dtr CM would like to speak to u CM [Name Redacted] [Phone Number Redacted] | I believe "Dtr" refers to doctor and "CM" refers to a case manager. |
| CW-1: | Ok will do.  Thank you.  Does CM wants to connect with us too? | By asking whether the case manager wanted "to connect with us too," CW-1 was asking whether the CW-1 should offer to pay kickbacks to the case manager. |
| TACORDA: | No she doesn't do that | |
| CW-1: | Like RMC or no | |
| TACORDA: | I'll take care of her next week for lunch or something | Based on the context of this conversation, I believe that TACORDA is indicating that the case manager does not accept kickback payments and prefers to have TACORDA pay for meals instead. |
| TACORDA: | I told her we work closely n help each other | |

16

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| TACORDA: | Let me know if u got referral | |
| TACORDA: | It's good medicare | Based on my training and experience, patients or beneficiaries with Medicare are highly desired due to Medicare's high reimbursement rate for home health and hospice services. |
| CW-1: | Ok perfect | |
| CW-1: | Once we open will set up a meeting with you | I believe CW-1's statement "Once we open will set up a meeting with you" to mean that they will set up an in-person meeting with TACORDA to facilitate her kickback payment once the patient is confirmed. |

27.   On or about March 28, 2018, the UCE met with TACORDA to discuss the patient referral made by TACORDA on March 24, 2018, and the corresponding kickback payments.  The meeting was recorded. During the meeting, the UCE paid TACORDA a total of $500 in cash for the referral of one patient.  This conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Verbal Statement | Additional Explanation |
|---|---|---|
| UCE: | Alright, I can send you on your way.  Would you- here or the car or? | I believe the UCE was asking TACORDA if she would like to be paid in the location where they were currently sitting or in a vehicle to further conceal the kickback payment. |
| TACORDA: | Um, don't matter. | |
| UCE: | Ok. Alright. | |
| TACORDA: | Safe right [laughs] | |
| UCE: | Yeah, no it's . . . So this is one, right? | I believe the UCE followed up by asking if the payment was for the referral of one patient, which TACORDA confirmed. |

| Speaker | Verbal Statement | Additional Explanation |
|---|---|---|
| TACORDA: | Um, yeah. | |
| UCE: | Alright, one patient is 500. | At this point in the meeting, the UCE handed an envelope with $500 cash inside to TACORDA, who accepted it. |
| TACORDA: | And I will, you know like I said, will keep you guys in mind all the time, so [laughs] | |
| UCE: | Alright. | |

28.  On or about May 22, 2018, the UCE conducted a consensually recorded conversation with TACORDA.  During the conversation, the UCE explained to TACORDA that HHA Alpha was no longer able to accept patients.  However, the UCE offered to pay TACORDA a retainer, meaning that once HHA Alpha changed ownership then TACORDA would be able to resume sending patient referrals to HHA Alpha in exchange for payment.  The UCE offered TACORDA $1,000 per month as a retainer for TACORDA's referral services, which TACORDA accepted.  During this meeting the UCE gave TACORDA the $1,000 in cash in a white envelope. TACORDA continued her agreement with the UCE by accepting "retainer fees" of $1000 per month with the intended purpose of the resuming patient referrals to HHA Alpha when notified by the UCE. Based on her conduct in the UCO, it is believed any anticipated referrals from TACORDA would be sent from sources either, paid directly by the UCE and arranged by TACORDA, or directly through TACORDA herself.

29.  On or about August 8, 2018, the UCE conducted a consensually recorded conversation with TACORDA.  During the conversation, the UCE paid TACORDA another $1,000 retainer, in cash, under their kickback patient referral agreement.

30.  Continuing the UCE's agreement with TACORDA, on or about November 5, 2018, the UCE paid TACORDA another $2,000 retainer, in

cash, to retain TACORDA's services.  As before, this meeting was recorded. This conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Verbal Statement | Additional Explanation |
|---|---|---|
| UCE: | Um yeah so um things are good so the one thing I wanted to ask you is – | |
| TACORDA: | Yeah. | |
| UCE: | – we're just about, we think we're really close and so the one thing that we wanted to do, is you've been really great like you've done, you've given us patients and you've given us people – | I believe the UCE was explaining that HHA Alpha was about to open under new ownership and TACORDA had been helpful by referring patients to HHA Alpha and introducing individuals willing to accept kickbacks for the referral of patients, i.e. TIRONA. |
| TACORDA: | Mmhmm. | |
| UCE: | – like you know Terence and whatever.  So going forward we don't care which. | |
| TACORDA: | Uh-huh. | |
| UCE: | Do you have a, do you have a preference on what you wanna do for us I mean the same deal and we'll, we'll give we will, will envelopes for both I just wanna know what you prefer doing. | I believe the UCE's use of "envelopes" refers to kickback payments usually in the form of a cash payment and placed into an envelope for concealment. |

| Speaker | Verbal Statement | Additional Explanation |
|---|---|---|
| TACORDA: | Um I think a little bit of both. | I believe TACORDA was willing to continue to provide both patients and introduce the UCE to individuals willing to accept kickbacks for the referral of patients. |
| UCE: | Okay, okay.  That's fine with me if we just keep what we've had before – | I believe TACORDA and the UCE decide to maintain the same terms as previously negotiated, i.e. $500 for each patient referral and $500 for the introduction of individuals willing to accept kickbacks for the referral of patients. |
| TACORDA: | Uh-huh. | |
| UCE: | – because obviously your. | |
| TACORDA: | Are we, are you guys um up in like taking patients again? | |
| UCE: | Not quite yet um – | |
| TACORDA: | Oh okay. | |
| UCE: | – so anyway um before I forget.  Here you go thank you ma'am, one thousand in each. | At this point, the UCE handed TACORDA two envelopes containing $1,000 in cash for a total of $2,000. |
| TACORDA: | Yeah thank you. | |
| UCE: | No problem. | |

## C.   TACORDA'S STATEMENTS TO FEDERAL LAW ENFORCEMENT OFFICERS

31.   On January 16, 2019, during the execution of a search warrant for TACORDA's cellular telephone, TACORDA confirmed the receipt of kickback payments from the UCE for the referral of patients to HHA Alpha.  TACORDA made the following statements to Federal Law Enforcement Officers employed by the FBI. The conversation was recorded.

**AGENT 1:** Ok, so you received money in exchange for the referral of patients.

**TACORDA:** From [UCE], yes.

**AGENT 1:** Ok, alright...

**AGENT 2:** And what did you do with that?

**TACORDA:** Spent it, I don't know.

...

**AGENT 1:** Alright.  So you accept money-

**TACORDA:** Yes.

**AGENT 1:** -from [UCE] in exchange for the referral of patients. Ok, and for connecting [UCE] with, with who?

**TACORDA:** Yes.  My contacts.

**AGENT 1:** And who are your contacts?

**TACORDA:** My case managers.

**AGENT 1:** Ok, at like can you give an example of a place where they're a case manager?

**TACORDA:** Hospital.

**AGENT 1:** Hospital, ok.  And what were those case managers going to do?

**TACORDA:** Refer patients.

**AGENT 1:** Refer patients, ok.  Did you know that was illegal?

**TACORDA:** [Unintelligible]

**AGENT 1:** Ok, so you knew it was illegal, ok, that's good.  Thank you.  We know that-that's one of those questions where I already knew the answer to it, I know that's illegal and you know that's illegal.

III. PROBABLE CAUSE FOR THE VIOLATION

32.  **Title 42 United States Code, Section 1320a-7b(b)(1)(A)**, in relevant part, makes it a crime to knowingly and willfully solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to in return for referring an individual to a person for the furnishing or

arranging from the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

33. Medicare is a federally funded health insurance program that provides funds for health care services provided to individuals aged 65 or above, and to certain disabled persons. The U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS") administers the Medicare program, which is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

34. Therefore, the referral of Medicare patients for home health services, which is subsequently billed to Medicare, constitute a referral for an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program; and an arrangement or ordering of a service for which payment may be made in whole or in part under a Federal health care program, as defined by 42 U.S.C § 1320a-7b(b)(1)(A) and (B).

35. Thus, TACORDA's receipt of payments from an FBI Undercover Employee in exchange for the referral of Medicare patients, in violation of Title 42 United States Code, Section 1320a-7b(b)(1)(A), the anti-kickback act.

36. The above allegations are supported by witness statements, recorded statements, and corroborating documentary evidence.

IV. CONCLUSION

37. Based on the foregoing, there is probable cause to believe TACORDA received kickback payments in exchange for the referral

Medicare patients for home health or hospice services, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(1)(A).

V.    REQUEST FOR SEALING

38.    Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation.  Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.  Accordingly, I respectfully request the Court issue an order directing this Affidavit and any related documents be sealed until the further order of this Court.

_____
Katelyn McKendrick, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 3rd day of September, 2019.

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge

23